**Opinion issued March 5, 2020**



In The

# Court of Appeals

For The

# First District of Texas

_____

### NO. 01-19-00685-CV

_____

## IN THE INTEREST OF M.A.J. JR., H.A.J., AND B.D.J., CHILDREN

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-04197J**

---

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, mother, challenges the trial court's

order, entered after a bench trial, terminating her parental rights to her minor

children, M.A.J. Jr. ("M.A.J."), H.A.J., and B.D.J. (collectively, "the children").[2] In

---

[1]  *See* TEX. FAM. CODE ANN. § 263.405(a); TEX. R. APP. P. 28.4.

[2]  The trial court also terminated the parental rights of the children's father. He is not a party to this appeal.

four issues, mother contends that the evidence is legally and factually insufficient to support the trial court's findings that she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being;[3] she constructively abandoned the children, who had been placed in the permanent or temporary management conservatorship of the Department of Family and Protective Services ("DFPS") for not less than six months;[4] she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children;[5] and termination of her parental rights was in the best interest of the children.[6]

We affirm in part and reverse in part.

## Background

On August 22, 2018, the DFPS filed a petition seeking termination of mother's parental rights to the children and managing conservatorship of the children.

---

[3]  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

[4]  *See id.* § 161.001(b)(1)(N) (trial court may order termination of parental rights if it finds by clear and convincing evidence that parent constructively abandoned child who had been in permanent or temporary managing conservatorship of DFPS for not less than six months and (i) DFPS had made reasonable efforts to return child to parent; (ii) parent had not regularly visited or maintained significant contact with child; and (iii) parent had demonstrated inability to provide child with safe environment).

[5]  *See id.* § 161.001(b)(1)(O).

[6]  *See id.* § 161.001(b)(2).

2

### DFPS Caseworker Cano

At trial, DFPS caseworker Gabriela Cano testified that M.A.J. was four years old and both H.A.J. and B.D.J. were one year old. H.A.J. and B.D.J. are twins. Cano stated that the children entered the care of DFPS based on an allegation of negligent supervision occurring on June 24, 2018. DFPS's records also indicated that there was an incident involving injury to M.A.J. on July 23, 2018, but Cano did not know anything about the incident. Cano did not ever see any injuries on M.A.J. and did not see any photographs of injuries on M.A.J. When asked whether mother was "the alleged perpetrator of the physical abuse against [M.A.J.]," Cano acknowledged that she did not know. Instead, Cano stated that she "believe[d]" that it was "a failure to protect on [mother's] part." When questioned regarding "the conditions of the children . . . when they first came into [DFPS's] care," Cano admitted that the children were "well."

The children had been in their current placement, an "adoptive" home, for three months. According to Cano, the home was stable. When asked whether "[t]he current placement [was] doing well," Cano responded, "[y]es." Cano also stated that the children's needs were being met, including "[t]herapeutically." The children did not have any special needs, but H.A.J. and B.D.J. participated in occupational therapy and speech therapy. M.A.J. participated in individual therapy at school. DFPS's goal for the children was an unrelated adoption. M.A.J. attended daycare.

3

In regard to mother, Cano explained that mother was given a Family Service Plan ("FSP") and Cano discussed the FSP with mother. Mother had completed some of the requirements of her FSP, including completing her psychological evaluation and her substance abuse assessment. Without any specificity, Cano stated that mother had used narcotics in the past and continued to do so. Although mother had been referred to outpatient treatment for her substance-abuse issues, mother had not completed the treatment.[7] According to Cano, mother had not regularly visited the children during the pendency of the case, but this was because the trial court had suspended her visits at the beginning of the case. Cano faulted mother for having her visits with the children suspended. Cano noted that mother was not present at trial.

Finally, Cano summarily testified that mother had engaged in a continuous course of conduct that had endangered the physical and emotional well-being of the children; the children's "circumstances ha[d] substantially improved from the time they came into care"; and it would be in the best interest for mother's parental rights to the children to be terminated.

### Child Advocates Volunteer Clark

Child Advocates Inc. ("Child Advocates") volunteer Kristy Clark testified that the children were doing well in their current home and DFPS's goal was to have

---

[7]     *Cf. infra.*

the children adopted. Clark opined that M.A.J. needed "a little bit more therapy" and "had some trouble adjusting" to being in DFPS's care. Clark also explained that while the children were in DFPS's care, they were neglected in a previous foster home.

### Mother's FSP

The trial court admitted into evidence mother's FSP, which stated that DFPS received a referral for negligent supervision of M.A.J. on July 3, 2018. The referral also alleged that mother had engaged in narcotics use. According to the FSP, on July 24, 2018, mother tested positive for methamphetamine, amphetamine, and marijuana use. The FSP noted that mother had the support of the family of the children's father, and DFPS's permanency goal, when the FSP was issued, was family reunification for the children and mother.

### Narcotics-Testing Results

The trial court admitted into evidence the results from mother's narcotics-use testing before and during the pendency of this case. Mother tested negative for narcotics use in April 2016 (hair follicle test), on November 8, 2018 (urinalysis), on November 28, 2018 (urinalysis and hair follicle test), and on December 11, 2018 (urinalysis).[8]

---

[8] Mother also tested negative for alcohol use on March 27, 2019 (urinalysis).

Mother tested positive for amphetamine, methamphetamine, and marijuana use on July 24, 2018 (urinalysis); positive for marijuana use on September, 6 2018 (hair follicle test); positive for marijuana use on November 8, 2018 (hair follicle test), positive for marijuana use on December 11, 2018 (hair follicle test), positive for marijuana use on January 16, 2019 (urinalysis and hair follicle test), positive for marijuana use on February 13, 2019 (urinalysis), positive for marijuana use on March 14, 2019 (urinalysis), and positive for marijuana use on May 14, 2019 (hair follicle test).

Mother did not submit to narcotics-use testing on October 15, 2018 or on February 8, 2019.

### Incident/Investigation Report

The trial court admitted into evidence a Harris County Sheriff's Office ("HCSO") incident/investigation report dated July 23, 2018 related to an incident of injury to a child. The report classifies mother as the "reportee" of the incident during which MA.J. was injured. When a law enforcement officer arrived at mother's home, he saw M.A.J., who was three years old at the time, wearing a shirt, shorts, and no shoes. M.A.J. had redness and swelling around both of his eyes, minor scrapes on the right side of his chin and along his forehead, and swollen wrists. Mother reported that M.A.J. had been playing with a neighbor, a five-year-old child, D.G., in the yard when the two children began fist-fighting. D.G. hit M.A.J. and

6

M.A.J. fell to the ground. M.A.J. then got back up and the children continued fighting. M.A.J. eventually knocked D.G. to the ground. D.G.'s mother then approached the two children and struck M.A.J. with the back of her hand. This caused M.A.J. to fall to the ground and "scream in pain." Mother stated that she did not intervene in the fight because D.G. had been the aggressor and he was "losing." The law enforcement officer noted that M.A.J.'s injuries were consistent with "being in a fight with a larger child" and were not consistent with being struck by an adult.

In regard to mother's home at the time, the law enforcement officer stated in the report that the property "contained various scrap metal piles and junked vehicles." "Rusted scrap metal and broken glass were found on the ground throughout the property," and there were "numerous safety hazards."

A follow-up supplemental report states that there was "no further investigation [into the incident] by the Special Victims/Child Abuse Unit." "The allegations of injury to a child were due to[] 3 year old [M.A.J.] and 5 year old [D.G.] engag[ing] in a physical altercation outside their residence." Both parents were present and observed the altercation. D.G.'s mother "broke up the fight," but M.A.J. was struck in his back with her hand. The law enforcement officer reviewing the incident concluded that it involved a "mutual combat between 2 children." And the case was closed.

7

*Mother*

At the hearing on her motion for new trial,[9] mother testified that she was not present for trial because she did not receive notice of the trial date. Her attorney did not contact her to notify her that trial was set for July 30, 2019. Mother had appeared in court on other occasions during the pendency of the case, and if she had received notice of the trial date, she would have been present.

Mother further testified that she knew that she had the FSP and that she was supposed to complete the requirements listed in her FSP. Although she had not completed all of the requirements, she had completed some of them. Mother completed her parenting classes and her psychosocial assessment, and she had participated in individual counseling. Mother was looking for employment at the time of the new-trial hearing, but she noted that she had been employed during the pendency of the case. Mother listed several businesses where she had applied for employment. According to mother, in July 2019, she asked the trial court to allow her more time to complete the requirements of her FSP.

Mother also testified that she participated in narcotics-use testing when she "knew about it" and DFPS caseworker Cano told her that she had tested negative for

---

[9]   *See In re J.B.*, 259 S.W.3d 383, 384–86 (Tex. App.—Beaumont 2008, no pet.) (considering evidence from hearing on motion for new trial in concluding grounds for termination had been met and termination of parental rights in best interest of child).

narcotics use after March 2019. Mother believed, based on DFPS's representations, that she had not tested positive for narcotics use prior to trial.

Additionally, mother explained that she had moved out of the home where she and the children had been living about two months after the children were removed from her care. She now lived in a different home. Mother wanted to visit her children during the pendency of the case, but the trial court did not allow her to do so.

### *Permanency Hearing Record*

At the hearing on mother's motion for new trial, the trial court admitted into evidence the reporter's record from a permanency hearing on May 4, 2019. During that hearing, DFPS caseworker Cano testified that the children were currently placed in an adoptive home, where they had been for about two weeks. The "[c]urrent placement [was] doing well" and the children did not have any special needs. They were eating healthy. However, previously, the children were in a foster home where the foster parents did not feed them correctly. The children were malnourished as a result. The children had bruises and M.A.J.'s hair was falling out.

Additionally, Cano testified that mother had been given an FSP, and at the time of the hearing, she was working on the requirements. Mother had completed her psychosocial evaluation, substance abuse treatment, and some of her parenting classes. Mother had not yet provided proof of housing or a stable income and had

not started individual therapy. Mother last tested positive for marijuana use in March 2019. Cano noted that mother wanted to complete the requirements of her FSP, and mother planned to move to a new home "permanently." Mother had provided Cano with a family friend for possible placement of the children, but DFPS had not yet completed a home study. DFPS was opposed to mother visiting the children due to her positive narcotics-use testing results in the past.

Child Advocates volunteer Clark testified at the hearing that she had visited the children once in their new placement, it was "absolutely wonderful" and "appropriate." Clark also summarily stated that mother's parental rights to her children should be terminated.

Clark additionally explained that she was concerned for the welfare of the children in their previous foster home because M.A.J.'s hair was failing out and he had "a huge bruise on his head" and B.D.J. had a bruise on her cheek. Clark took the children to the hospital because of their condition, and at the hospital, it was determined that the children were extremely malnourished, causing their ribs to be exposed.

### Standard of Review

A parent's right to "the companionship, care, custody, and management" of her children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The

10

United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore

12

the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

**Sufficiency of Evidence**

In her fourth issue, mother argues that the trial court erred in terminating her parental rights to the children because the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, that termination of parental rights is in the best interest of the children. *See id.* § 161.001(b). The best-interest analysis evaluates the best interest of the children. *See In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). It is presumed that the prompt and permanent placement of the children in a safe environment is in their best interest. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re D.S.*, 333 S.W.3d at 383.

13

There is also a strong presumption that the children's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Thus, we strictly scrutinize termination proceedings in favor of the parent. *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.). And because of the strong presumption in favor of maintaining the parent-child relationship and the due process implications of terminating a parent's rights to her minor children without clear and convincing evidence, "the best interest standard does not permit termination merely because . . . child[ren] might be better off living elsewhere." *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (internal quotations omitted); *see also In re W.C.*, 98 S.W.3d 753, 758 (Tex. App.—Fort Worth 2003, no pet.). Termination of parental rights should not be used as a mechanism to merely reallocate children to better and more prosperous parents. *In re J.G.S.*, 574 S.W.3d at 121–22; *In re W.C.*, 98 S.W.3d at 758; *see also In re E.N.C.*, 384 S.W.3d at 809; *In re C.R.*, 263 S.W.3d 368, 375 (Tex. App.—Dallas 2008, no pet.).

Moreover, termination is not warranted "without the most solid and substantial reasons." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976) (internal quotations omitted); *see also In re N.L.D.*, 412 S.W.3d at 822. And in parental-termination proceedings, DFPS's burden is not simply to prove that a parent

14

should not have custody of her children; DFPS must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with her children whatsoever. *See In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.); *see also In re J.A.J.*, 243 S.W.3d 611, 616–17 (Tex. 2008) (distinguishing conservatorship from termination).

In determining whether the termination of mother's parental rights is in the best interest of the children, we may consider several factors, including: (1) the children's desires; (2) the current and future physical and emotional needs of the children; (3) the current and future emotional and physical danger to the children; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for the children by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re L.M.*, 104 S.W.3d at 647. We may also consider the statutory factors set forth in Texas Family Code section 263.307. *See* TEX. FAM. CODE ANN. § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018); *In re C.A.G.*, No. 01-11-01094-CV, 2012 WL 2922544, at *6 & n.4 (Tex. App.—Houston [1st Dist.] June 12, 2012, no pet.) (mem. op.).

These factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to the termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors."). The absence of evidence about some of the factors would not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in the children's best interest. *In re C.H.*, 89 S.W.3d at 27; *In re J.G.S.*, 574 S.W.3d at 122.

Likewise, a lack of evidence on one factor cannot be used as if it were clear and convincing evidence supporting termination of parental rights. *In re E.N.C.*, 384 S.W.3d at 808; *In re J.G.S.*, 574 S.W.3d at 122. In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the children's best interest, while in other cases, there could be "more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice" to support termination. *In re C.H.*, 89 S.W.3d at 27; *see also In re J.G.S.*, 574 S.W.3d at 122. The presence of scant evidence relevant to each factor will generally not support a finding that termination of parental rights is in the children's best interest. *In re R.H.*, No. 02-19-00273-CV, 2019 WL 6767804, at *4 (Tex. App.—Fort Worth Dec. 12, 2019, pet. denied) (mem. op.); *In re A.W.*, 444 S.W.3d 690, 693 (Tex. App.—Dallas 2014, pet. denied).

### 1.  Children's Desires

At the time mother's parental rights were terminated, M.A.J. was four years old and both H.A.J., and B.D.J. were one year old.  Generally, when children are too young to express their desires, this factor is considered neutral.  *See In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.).  And here, there is no evidence indicating that the children did not want to be returned to mother's care. *See In re D.D.M.*, No. 01-18-01033-CV, 2019 WL 2939259, at *5 (Tex. App.— Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.) (factor weighed against termination where no evidence indicating children did not want to be placed with parent).

Further, Child Advocates volunteer Clark testified that M.A.J. has "had some trouble adjusting" after being removed from mother's care.  And at the time of trial, the children had only been in their current placement for a short period of time. There is no evidence in the record that the children were bonded to their current foster parents.  *Cf. In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *17–18 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (factor weighed in favor of termination where children, although young, were "very close" to foster family and "bonded" and relied on foster parents for emotional support; foster family was only family one child had ever known and he never left foster parents' side (internal quotations omitted)).  Mother testified that she wanted to see

17

the children, but she was prevented from doing so by the trial court. *See In re Z.B.*, No. 07-16-00026-CV, 2016 WL 3922936, at *7 (Tex. App.—Amarillo July 12, 2016, no pet.) (mem. op.). This factor does not weigh in favor of termination of mother's parental rights.

### 2. Current and Future Physical and Emotional Needs<br>Current and Future Physical and Emotional Danger

#### a. Condition of Home

The children need a safe and stable home. *See* TEX. FAM. CODE ANN. § 263.307(a) (prompt and permanent placement of child in safe environment presumed to be in child's best interest); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14 Dist.] 2014, no pet.) (parent who lacks ability to provide child with safe and stable home is unable to provide for child's emotional and physical needs). However, there is little evidence in the record regarding the condition of mother's home before the children were removed from her care. The only evidence comes from the HCSO incident/investigation report dated July 23, 2018, which states that the property where the children were living at the time "contained various scrap metal piles and junked vehicles," "[r]usted scrap metal and broken glass . . . on the ground," and "numerous safety hazards." Despite this description, there is no evidence in the record that the children were harmed by these conditions. Instead, DFPS caseworker Cano testified that the children were "well" when they were removed from mother's care. *See Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d

18

574, 577–78 (Tex. App.—Corpus Christi–Edinburg 1993, no writ) (for conditions to endanger well-being of children there must be connection between conditions and resulting danger to children's emotional or physical well-being).

The record also shows that mother moved away from the aforementioned home within two months of the children being removed from her care. And at the time of trial, she had a new residence, which DFPS caseworker Cano described as "permanent[]." There is no evidence regarding the condition of mother's new home, and there is no evidence that the home is unsafe or unstable. *See Ybarra*, 869 S.W.2d at 579; *see also Herrera v. Herrera*, 409 S.W.2d 395, 396 (Tex. 1966); *Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 101 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (DFPS has burden to rebut presumption that best interest of children is served by keeping custody with natural parent). A lack of evidence does not constitute clear and convincing evidence. *In re E.N.C.*, 384 S.W.3d at 808.

The record also does not contain evidence of the condition of the children's current placement.[10] *See In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio Aug. 28, 2013, no pet.) (holding evidence insufficient to support best-interest finding where no information about children's current caregivers or nature of environment

---

[10] The only evidence in the record concerned the children's previous foster home, where the children were not fed correctly, resulting in them becoming extremely malnourished. The children sustained bruises while in that home, and M.A.J.'s hair started falling out. Eventually, because of their condition, Child Advocates volunteer Clark took the children to the hospital.

19

caregivers provided children); *see also In re E.N.C.*, 384 S.W.3d at 808.  DFPS caseworker Cano opined that the children's current foster home was stable, and Child Advocates volunteer Clark stated that the children's new placement was "absolutely wonderful" and "appropriate."[11]  *See In re D.N.*, No. 12-13-00373-CV, 2014 WL 3538550, at *3–5 (Tex. App.—Tyler July 9, 2014, no pet.) (mem. op.) (holding evidence insufficient to support termination of parental rights and noting DFPS caseworker and children's attorney ad litem did not provide any facts to form basis of opinion).  But, conclusory opinion testimony, even if uncontradicted, does not amount to more than a scintilla of evidence; it is no evidence at all.  *See In re A.H.*, 414 S.W.3d at 807; *see also City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009) (opinion is conclusory "if no basis for the opinion is offered[] or the basis offered provides no support"); *Arkoma Basin Expl. Co. v. FMF Assocs. 1990–A, Ltd.*, 249 S.W.3d 380, 389 (Tex. 2008) (witness cannot "simply state a conclusion without any explanation" or ask trier of fact to just "take [her] word for it" (internal quotations omitted)); *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999) (witness "must explain the basis of his statements to link his conclusions to the facts").  This factor does not weigh in favor of termination of mother's parental rights.

---

[11]    At the time Clark made these statements, she had seen the children in their current placement one time.

### b. *Children's Needs*

DFPS caseworker Cano testified that the children do not have any special needs. At the time of trial, H.A.J. and B.D.J. participated in occupational therapy and speech therapy and M.A.J. participated in individual therapy at school. Child Advocates volunteer Clark stated that M.A.J. needed "a little bit more therapy."

There is nothing in the record to establish that the children's physical and emotional needs differ in any respect to that of other children their age or that their needs would go unmet if they were returned to mother's care. Likewise, the record does not show that mother did not meet the children's physical and emotional needs while they were previously in her care, nor is there evidence that mother would not be able to meet the children's needs in the future. *See In re E.N.C.*, 384 S.W.3d at 808 (no evidence indicating that children's needs differ from other children or would go unmet if children were returned to parent); *In re D.D.M.*, 2019 WL 2939259, at *6 (DFPS presented no evidence that parent could not meet children's therapeutic needs); *In re E.W.*, 494 S.W.3d 287, 300–01 (Tex. App.—Texarkana 2015, no pet.). In fact, DFPS caseworker Cano testified that when the children were removed from mother's care, they were "well." *See In re W.C.*, 98 S.W.3d at 758 (no evidence parent failed to meet children's needs in past).

And although Cano also testified that the children's current placement was meeting their needs, this is nothing more than a conclusory opinion. *See In re A.H.*,

21

414 S.W.3d at 807; *see also Pollock*, 284 S.W.3d at 818; *Arkoma Basin*, 249 S.W.3d at 389; *Earle*, 998 S.W.2d at 890.  All the record reveals about the children's current placement is that in May 2019, two months before trial, they were eating healthy. This factor does not weigh in favor of termination of mother's parental rights.

### c. Danger to Children

DFPS caseworker Cano testified that the children entered the care of DFPS based on an allegation of negligent supervision occurring on June 24, 2018, but Cano knew nothing about the allegation and did not testify that it was mother who had allegedly not supervised M.A.J. properly.[12]  Cano also knew nothing about an incident involving injury to M.A.J. on July 23, 2018.  Cano only speculated that it was "a failure to protect on [mother's] part" and offered conclusory testimony that mother had engaged in a continuous course of conduct that had endangered the physical and emotional well-being of the children.  *See Coastal Transport Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) ("Opinion testimony that is conclusory or speculative is not relevant evidence . . . ."); *In re D.N.*, 2014 WL 3538550, at *3–5 (holding evidence insufficient to support termination of parental rights and noting DFPS caseworker and children's attorney ad litem did not provide any facts to form basis of opinion); *In re A.H.*, 414 S.W.3d

---

[12]    Mother's FSP notes that there was an allegation of negligent supervision of M.A.J. on July 3, 2018, but it provides no details and does not allege that mother was involved.  *See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012).

22

at 807; *see also Pollock*, 284 S.W.3d at 818; *Arkoma Basin*, 249 S.W.3d at 389; *Earle*, 998 S.W.2d at 890.

The HCSO incident/investigation report dated July 23, 2018 states that mother reported an incident after M.A.J. was injured while fighting with another child. A law enforcement officer who arrived at mother's home examined M.A.J., who had redness and swelling around both of his eyes, minor scrapes on the right side of his chin and along his forehead, and swollen wrists. Mother told the officer that M.A.J. was playing with a neighbor, a five-year-old child, D.G., in the yard when the two children began fist-fighting. D.G. hit M.A.J. and M.A.J. fell to the ground. M.A.J. then got back up and the children continued fighting. M.A.J. eventually knocked D.G. to the ground. D.G.'s mother then approached the two children and struck M.A.J. with the back of her hand. This caused M.A.J. to fall to the ground and "scream in pain." The law enforcement officer noted that M.A.J.'s injuries were consistent with "being in a fight with a larger child" and were not consistent with being struck by an adult.

A follow-up supplemental report states that there was "no further investigation [into the incident] by the Special Victims/Child Abuse Unit." "The allegations of injury to a child were due to[] 3 year old [M.A.J.] and 5 year old [D.G.] engag[ing] in a physical altercation outside their residence." Both parents were present and observed the altercation. D.G.'s mother "broke up the fight," but M.A.J.

23

was struck in his back with her hand. The law enforcement officer reviewing the incident concluded that it involved a "mutual combat between 2 children." And the case was closed.

The record does not contain evidence that mother acted aggressively or violently toward the children while they were in her care. And there is no evidence that mother negligently supervised the children and exposed them to danger. *See In re E.N.C.*, 384 S.W.3d at 808, 810 ("A lack of evidence does not constitute clear and convincing evidence."); *In re J.C.*, No. 12-19-00102-CV, 2019 WL 3940803, at *4–5 (Tex. App.—Tyler Aug. 21, 2019, no pet.) (mem. op.). In fact, DFPS's initial permanency goal was family reunification for the children and mother. And the HCSO incident/investigation report indicates that mother reported the incident during which M.A.J. was injured by another child.

Significantly, the record reveals that while the children have been in DFPS's care, they were placed in a foster home where they were not fed properly, and they became extremely malnourished. Additionally, while in that placement, the children suffered bruises, their ribs became exposed because of malnutrition, and M.A.J.'s hair started falling out. Eventually, Child Advocates volunteer Clark took the children to the hospital because of their condition. *In re C.T.E.*, 95 S.W.3d 462, 468 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (considering emotional and physical danger to children while in DFPS's care). Clark testified that the children

24

were neglected in that foster home. This factor does not weigh in favor of termination of mother's parental rights.

### d. Narcotics Use

Without providing details or specifics, DFPS caseworker Cano testified that mother had used narcotics in the past and continued to do so. She also stated that mother had not completed her outpatient treatment related to her substance-abuse issues. However, Cano testified at the May 4, 2019 permanency hearing that mother had completed her substance abuse treatment.

Mother's FSP states that DFPS received a referral alleging that mother had engaged in narcotics use. The FSP also notes that on July 24, 2018, mother tested positive for methamphetamine, amphetamine, and marijuana use.

Mother's narcotics-use testing results indicate that she tested positive for amphetamine, methamphetamine, and marijuana use on July 24, 2018 (urinalysis).[13] Thereafter, mother tested positive for marijuana use on September 6, 2018 (hair follicle test), positive for marijuana use on November 8, 2018 (hair follicle test), positive for marijuana use on December 11, 2018 (hair follicle test), positive for marijuana use on January 16, 2019 (urinalysis and hair follicle test), positive for marijuana use on February 13, 2019 (urinalysis), positive for marijuana use on

---

[13] This appears to be the same testing result referenced in mother's FSP.

March 14, 2019 (urinalysis), and positive for marijuana use on May 14, 2019 (hair follicle test).[14]

However, mother also tested negative for narcotics use in April 2016 (hair follicle test), on November 8, 2018 (urinalysis), on November 28, 2018 (urinalysis and hair follicle test), and on December 11, 2018 (urinalysis). Mother testified that, based on DFPS's representations to her, she believed that she had not tested positive for narcotics use before trial.

Narcotics use by a parent is certainly not desirable. *See In re C.V.L.*, No. 05-19-00506-CV, --- S.W.3d ---, 2019 WL 6799750, at *13 (Tex. App.—Dallas Dec. 13, 2019, pet. filed) (agreeing parent's narcotics use constituted factor to be considered in best-interest analysis); *see also In re J.N.*, 301 S.W.3d 429, 434–35 (Tex. App.—Amarillo 2009, pet. denied) (although parent tested positive for narcotics use, holding evidence factually insufficient to support trial court's determination termination of parental rights in best interest of child). However, there is no evidence in the record that mother used narcotics in the presence of the children or while she was caring for them. And there is no evidence that mother was impaired while caring for the children. DFPS caseworker Cano's testimony regarding

---

[14] Mother did not submit to narcotics-use testing on October 15, 2018 or on February 8, 2019. Mother testified that she participated in narcotics-use testing when she "knew about it."

narcotics use by mother is speculative and conclusory at best, and it is unclear at times during her testimony whether she is even referring to narcotics use by mother.

Notably, the results from mother's April 2016 narcotics-use testing, while M.A.J. was in her care, show that mother tested negative for narcotics use. Further, the only time that mother tested positive for amphetamine or methamphetamine use in this case was on July 24, 2018—a year before trial. And although mother tested positive for marijuana use at times during the pendency of the case, on several occasions mother tested negative or both positive and negative for marijuana use on the same date.[15] Finally, DFPS caseworker Cano stated that mother had completed her substance abuse treatment. *See In re C.V.L.*, 2019 WL 6799750, at *12–15 (refusing to hold, solely based on evidence of parent's narcotics use, that evidence was sufficient to support termination of parental rights); *Turner v. Lutz*, 685 S.W.2d 356, 360–61 (Tex. App.—Austin 1984, no writ) (evidence of parent's "alcohol problem" did not include any evidence showing emotional or physical danger to children); *cf. In re G.N.*, 510 S.W.3d 134, 135, 138–40 (Tex. App.—El Paso 2016, no pet.) (parent had "history of substance abuse, including use of cocaine, marijuana, and opiates" and "a substantial criminal history which include[d] . . . four cases

---

[15] We note that courts' consideration of parental marijuana use in termination-of-parental-rights cases is evolving. *See, e.g.*, *In re N.J.H.*, 575 S.W.3d 822, 836–41 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (Brown, J., concurring).

27

involving possession of drugs"; parent did not address his "substance abuse issues" and "refused to be tested for drugs after a pipe containing cocaine was found in his vehicle"); *In re A.C.*, 394 S.W.3d at 642 ("The mother admitted she had used drugs during her pregnancy even though she knew it might harm the child. She tested positive for drugs a month after the child was removed. And she used drugs even though that violated the conditions of her probation, resulting in her going to jail, away from the child."). This factor only weighs slightly in favor of termination of mother's parental rights.

### 3. Parental Abilities, Plans for Children, Stability of Proposed Placement, and Availability of Assistance

*a. Mother*

DFPS casework Cano testified that when the children were removed from mother's care, they were "well." Cano also acknowledged that mother had completed some of the requirements of her FSP, including her psychosocial evaluation, substance abuse treatment, and some of her parenting classes. And Cano noted that mother wanted to complete the requirements of her FSP. Although mother had not visited the children during the pendency of the case, this was because the trial court had suspended her visits at the beginning of the case, and DFPS opposed mother visiting the children.

Mother testified that she had completed some of the requirements of her FSP, including her psychosocial assessment, parenting classes, and she had participated

28

in individual counseling. Mother had worked during the pendency of the case and she was actively looking for employment. Mother wanted to visit her children, but the trial court did not allow her to do so. In July 2019, mother requested that the trial court allow her more time to complete the requirements of her FSP.

As previously noted, there is little evidence in the record regarding the condition of mother's home before the children were removed from her care. The only evidence comes from the HCSO incident/investigation report dated July 23, 2018, which states that the property where the children were living at the time "contained various scrap metal piles and junked vehicles," "[r]usted scrap metal and broken glass . . . on the ground," and "numerous safety hazards." However, there is no evidence in the record that the children were harmed by any of these conditions. *See Ybarra*, 869 S.W.2d at 577–78 (for conditions to endanger well-being of children there must be connection between conditions and resulting danger to children's emotional or physical well-being).

The record also shows that mother moved away from the aforementioned home within two months of the children being removed from her care. And at the time of trial, she had a new residence, which DFPS caseworker Cano described as "permanent[]." There is no evidence regarding the condition of mother's new home, and there is no evidence that the home is unsafe or unstable. *See Ybarra*, 869 S.W.2d at 579; *see also In re E.N.C.*, 384 S.W.3d at 808; *Herrera*, 409 S.W.2d at 396;

29

*Toliver*, 217 S.W.3d at 101 (DFPS has burden to rebut presumption that best interest of children is served by keeping custody with natural parent). This factor does not weigh in favor of termination of mother's parental rights.

### b. Children's Current Placement

As previously noted, the record contains no evidence of the condition of the children's current placement. There is also no evidence regarding the parental abilities of the children's current foster parents or the environment that they have provided the children. *See In re E.N.C.*, 384 S.W.3d at 808. At the time of trial, the children had only been in their placement for a short period of time. And although DFPS caseworker Cano testified that the children were residing in an "adoptive" home, there is no evidence that the children's current placement wants to adopt them or wants the children to remain in the home. *See Horvatich v. Tex. Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601–04 (Tex. App.—Austin 2002, no pet.) (holding evidence insufficient to support finding termination in best interest of children where record not developed concerning current circumstances of children); *see also In re E.N.C.*, 384 S.W.3d at 808–09 (DFPS "presented no evidence that another family wishe[d] to adopt the children, or that the children's foster parents c[ould] provide for them in a way [their parent could] []not."). All the record reveals about the children's current placement is that in May 2019, two months before trial, the children were eating healthy.

Additionally, the evidence in the record shows that while in DFPS's care, the children have been neglected and not provided with a safe and stable home. *See In re C.T.E.*, 95 S.W.3d at 468. This factor does not weigh in favor of termination of mother's parental rights.

DFPS must support its allegations against a parent, including its allegation that termination of parental rights is in the best interest of the children, by clear and convincing evidence; conjecture or a preponderance of evidence is not enough. *See In re E.N.C.*, 384 S.W.3d at 808–10; *see also In re R.H.*, 2019 WL 6767804, at *4; *In re A.W.*, 444 S.W.3d at 693 (presence of scant evidence relevant to each factor will generally not support finding that termination of parental rights is in children's best interest); *Toliver*, 217 S.W.3d at 101 (DFPS has burden to rebut presumption that best interest of children is served by keeping custody with natural parent).

Viewing the evidence in a neutral light, we conclude that a reasonable fact finder could not have formed a firm belief or conviction that termination of mother's parental rights was in the best interest of the children. Accordingly, we hold that the evidence is factually insufficient to support the trial court's finding that termination of mother's parental rights is in the best interest of the children.

We sustain mother's fourth issue.[16]

---

[16] Although we recognize the trial court and the parties in this proceeding had many hearings before the date of trial, we emphasize that none of the previous hearings constitute evidence that can support the trial court's order terminating mother's

Due to our disposition of mother's fourth issue, we need not address the other issues raised on appeal. *See* TEX. R. APP. P. 47.1.

**Conclusion**

We reverse the portion of the trial court's order terminating mother's parental rights and remand the case to the trial court for a new trial. *See* TEX. R. APP. P. 28.4(c); *In re J.O.A.*, 283 S.W.3d 336, 347 (Tex. 2009). Because mother did not challenge the trial court's appointment of DFPS as the children's sole managing conservator, we affirm that portion of the trial court's order. *See In re J.A.J.*, 243 S.W.3d at 612–13.

---

parental rights to her children. The only evidence that can support the trial court's order is that evidence *admitted* at trial. The reporter's record from trial in this case is thirty-two pages total, including the cover, list of appearances, table of contents, and court reporter's certificate. Although the trial court admitted twenty-five exhibits into evidence at trial, the majority of them either do not relate to mother or have no bearing on whether or not her parental rights should have been terminated. The reporter's records from the hearing on mother's motion for new trial are also lacking. *Cf. In re E.F.*, 591 S.W.3d 138, 142 n.4 (Tex. App.—San Antonio 2019, no pet.).

We are cognizant of the extraordinary burdens placed on all participants in termination-of-parental-rights cases, but given the constitutional rights of the parents involved in such proceedings, the interests of the children involved, and the effect that placement of the children will have on numerous lives, it is imperative that the parties completely develop the evidence at trial. *See id.* There is a reason the law sets a high evidentiary bar for the termination of parental rights. *See Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. . . . If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections . . . ."). To the extent that our dissenting colleague references matters not admitted into evidence at trial, we take exception.

32

Julie Countiss
Justice

Panel consists of Justices Keyes, Goodman and Countiss.

Keyes, J., dissenting.